**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| XTTRIUM LABORATORIES, INC., a Delaware Corporation, | |
| Plaintiff, | |
| v. | Case No. |
| RAM CHAKROBORTY, an individual; and BAJAJ MEDICAL, LLC, an Illinois Limited Liability Company, | |
| Defendants. | |

## COMPLAINT

Plaintiff, Xttrium Laboratories, Inc. ("Xttrium"), by its counsel, respectfully submits this Complaint for Damages and Injunctive Relief, and, in support of its claims against the Defendants, states as follows:

### Nature of the Dispute

1.      This action arises after a trusted consultant and fiduciary executed a scheme with other bad actors to defraud Xttrium out of millions of dollars and its intellectual property rights in cutting edge antiseptic research and development.

2.      Defendant Ram Chakroborty ("Chakroborty"), along with Defendant Bajaj Medical, LLC ("Bajaj Medical"), schemed to deprive Xttrium of millions of dollars in investments and the subsequent rights to a new scientific synthesis process of manufacturing Chlorhexidine Gluconate ("CHG"), a formulation critical to the medical industry sold by Xttrium.

3.      Xttrium paid more than $9MM USD for the rights to the idea for the new CHG synthesis and to fund its research and development. At all times, Defendants, led by Chakroborty,

represented to Xttrium that the monies Xttrium invested were being used to develop this new formula.

4.      In reality, Defendants pocketed most of the investment for their own purposes and unlawfully misappropriated all intellectual property related to the new CHG formula.

5.      It was not until September 2022 that Xttrium learned of Defendants' fraud and misappropriation.

6.      Xttrium has also learned that Defendants are continuing to develop and commercialize the new CHG synthesis, despite previously representing to Xttrium that the project was dead. To do so, Defendants are utilizing documents, information, and research for which Xttrium entirely owns all intellectual property rights pursuant to the applicable agreement.

7.      This action seeks damages against Defendants based on theories of fraud, conspiracy, breach of fiduciary duty, and misappropriation of trade secrets.

## The Parties

8.      Xttrium is a Delaware corporation with its principal place of business in Illinois. Xttrium is therefore a citizen of Delaware and Illinois.

9.      Defendant Chakroborty is a resident of Illinois and, upon information and belief, resides at 9465 Falling Waters Drive W, Burr Ridge, Illinois 60527. Defendant Chakroborty is therefore a citizen of Illinois.

10.     Defendant Bajaj Medical is an Illinois limited liability company whose members are all residents of Illinois. Defendant Bajaj Medical is therefore a citizen of Illinois.

## Jurisdiction and Venue

11.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (actions arising under the laws of the United States) as this action arises, in part, under the federal Defend Trade Secrets Act ("DTSA"), § 18 U.S.C. 1831, *et seq*.

2

12. The Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction over claims relating to those for which the court has original jurisdiction), as each of the claims in this action are so closely related that they form part of the same case or controversy.

13. This Court has personal jurisdiction over Defendant Chakroborty, as he has frequent, continuous contacts with Illinois. Furthermore, Defendant Chakroborty committed his wrongful actions in violation of the law in Illinois, and breached his owed fiduciary duties while employed by Xttrium, in Illinois. Chakraborty planned and executed his unlawful scheme with Bajaj Medical, an Illinois company, while Chakraborty was in Illinois.

14. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) as a substantial portion of the acts, omissions and transactions giving rise to Xttrium's injury occurred in this district. Furthermore, Defendants' wrongful conduct occurred in Illinois, including the planning and execution of their unlawful scheme to injure Xttrium.

## Factual Background

**Xttrium's Business**

15. Xttrium was founded in 1932 as a family owned and operated company in the Chicago area.

16. Xttrium began as a small group of doctors and nurses working to treat individual patient needs. Today, the company offers more than 150 different FDA-approved infection prevention and healthcare products.

17. Xttrium takes great pride in being a leading manufacturer and supplier of antiseptic products across the country. Xttrium strives to be a leader in health, safety, and environmental performance while developing new strategies, standards, and systems for continuous improvement.

18.     With 85 years of experience, Xttrium is driven to provide solutions to a wide variety of health and safety concerns.

19.     Xttrium is the largest US supplier of FDA-approved 2 percent and 4 percent CHG formulations, which are the most effective known antiseptics for surgical hand scrubbing, health care personnel hand washing, preoperative skin preparation, and general skin and wound cleansing. Xttrium is also the leading US manufacturer of 20 percent CHG, another antiseptic active pharmaceutical ingredient.

20.     The CHG antiseptic skin cleanser was created with the primary purpose of preventing bacterial infection. Specific use includes surgical hand scrubbing, healthcare personnel hand washing, patient pre-operative skin preparation, skin wound, and general skin cleansing for infection control.

***Chakroborty's Fiduciary Duties for Xttrium***

21.     From 1992 until 2013, Chakroborty worked for Xttrium, eventually serving as Xttrium's CEO until his resignation.

22.     In this CEO role, Chakroborty managed all decision-making for Xttrium and all assets and personnel of the company. Chakroborty was also exposed to all of Xttrium's strategies, products, pricing, formulas, research, and know-how.

23.     On or about 2013, Xttrium and Chakroborty parted amicably, and Chakroborty resigned as CEO. Chakroborty, however, agreed to serve as a paid consultant and agent of Xttrium.

24.     In this new consultancy role, Chakroborty served as Xttrium's agent for, among other things, research, development, and the procurement of new technologies. Chakroborty also served as a trusted agent consultant for Xttrium's business affairs, strategies, and high-level decision-making, including Xttrium's business relationship with Bajaj Medical. Chakroborty also assisted Xttrium in securing CHG base, a key raw material Xttrium uses in all of its products.

4

25.     In this consultancy role, Chakroborty continued to retain access to Xttrium's confidential information and trade secrets.

26.     Chakroborty remained a paid consultant until 2016, after which Chakroborty continued to operate as an agent and trusted advisor of Xttrium, and close family friend of the company's owners, until 2022, when Xttrium discovered the facts giving rise to this Complaint.

27.     From 2013-2022, Xttrium's leadership ran nearly every major company decision by Chakroborty for his thoughts and advice.

28.     Chakroborty formed Bajaj Medical back in 2013. Chakroborty and his family members are listed as the managers of the entity, according to the Illinois Secretary of State's website.

29.     Chakroborty represented to Xttrium that he would act as Xttrium's agent through Bajaj Medical and have Bajaj Medical be the entity that, with Chakroborty, served as the intermediary and representative for Xttrium to procure new technologies.

30.     Chakroborty misrepresented to Xttrium that Bajaj Medical would serve only as an intermediary and agent, and that it was not a competitor of Xttrium.

31.     In fact, Bajaj Medical and Chakroborty were secretly taking steps to compete against Xttrium while at the same time purporting to act as agent for Xttrium in securing new technology.

***The 2015 Fraud***

32.     In 2015, while acting as Xttrium's agents, Defendants presented Xttrium with an opportunity to purchase the intellectual property rights in a new enzymatic synthesis for producing CHG (the "Synthesis") at a fraction of the cost.

33.     Defendants informed Xttrium that they had previously invested in the research and development of the Synthesis, and that in order for Xttrium to receive and continue to develop this

5

technology, Xttrium would need to: (1) reimburse Defendants for previous amounts invested in the research and development of the Synthesis in an amount totaling $4.5MM USD and (2) provide to Defendants, as agents and intermediaries, quarterly payments amounting to an additional $4.5MM USD to be disbursed to Bajaj Medical's research team for continued research and development.

34.    In proposing this plan, Defendants made material misrepresentations of fact to Xttrium in order to induce Xttrium to provide $9MM USD in payments to Bajaj Medical and Chakroborty.

35.    In actuality, Defendants had not invested any money in developing the Synthesis as of 2015, when they proposed this investment scheme to Xttrium.

36.    Furthermore, in proposing this investment scheme to Xttrium, Defendants secretly intended to pocket the money provided by Xttrium and not use the vast majority of the funds for research and development of the Synthesis.

37.    And, in proposing this investment scheme to Xttrium, Defendants also secretly intended to misappropriate any developed technologies resulting from the investment scheme.

38.    In light of Xttrium's history with Chakroborty and his status as a trusted advisor and fiduciary, Xttrium agreed to allow Defendants to spearhead this new Synthesis project on its behalf and serve as Xttrium's authorized agent.

39.    On April 29, 2015, Xttrium entered into a contract with Bajaj Medical, and an individual named Dr. Prajakta Dandekar Jain ("Jain"), who oversaw research and development for Defendants in India. This contract was facilitated by Defendants and recognized their role as agents and intermediaries of Xttrium.

40.     A true and accurate copy of the contract, entitled the 2015 Research and Intellectual Property Transfer Agreement (the "2015 Agreement"), is attached hereto as **Exhibit A**.

41.     According to the terms of the 2015 Agreement, Xttrium desired to retain Jain to develop the Synthesis using various enzymatic processes. (Ex. A at p. 1.)

42.     Xttrium retained all intellectual property rights in any Synthesis developed under the 2015 Agreement:

> **Intellectual Property Rights.**  Intellectual Property Rights means all rights in and to US and foreign (i) patents, patent disclosures, and inventions (whether patentable or not), (ii) trademarks, service marks, trade dress, trade names, logos, corporate names and domain names, and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing, (iii) copyrights and copyrightable works (including computer programs), maskworks, and rights in data and databases, (iv) trade secrets, know-how, and other confidential information, and (v) all other intellectual property rights, in each case whether registered or unregistered and including all registrations and applications for, and renewals or extensions of, such rights, and all similar or equivalent rights or forms of protection in any part of the world.
>
> Xttrium shall have sole ownership of all Intellectual Property Rights arising from this Agreement concerning the Product, Synthesis, or any related or similar product or synthesis owned or developed under this Agreement. No part of this Agreement shall be construed to apply to any Intellectual Property Rights owned by either Party prior to the execution of this Agreement or to any Intellectual Property Rights applicable to products or services other than the Product described herein. Intellectual Property which PDJ is assigning includes, but is not limited to, materials, methods, steps, and use and labeling of the Synthesis.

(Ex. A at pp. 2-3.)

43.     This included all patent and trademark rights, and to the extent any other intellectual property rights existed, Xttrium was entitled to be assigned those rights. (*Id.*)

44.     Thus, under the 2015 Agreement, Xttrium owned all intellectual property rights in the Synthesis.

45.    The 2015 Agreement also contained a nondisclosure agreement which required the parties to the 2015 Agreement to maintain confidentiality of all information associated with the Synthesis. (*Id*. at p. 6.)

46.    Per Defendants' proposal, the 2015 Agreement required that Xttrium pay Bajaj Medical $4.5MM USD as a reimbursement for funds expended in prior research and development of the Synthesis, and also remit the quarterly installment payments to Bajaj Medical, totaling an additional $4.5MM USD, for payment to its research and development team, including Jain. (*Id*. at p. 8.)

47.    Per the terms of the 2015 Agreement, Xttrium timely paid all amounts under the 2015 Agreement to Defendants totaling $9MM USD.

48.    Xttrium's payments were induced by Defendants' material misrepresentations regarding prior work on the Synthesis and desire to continue developing it for Xttrium.

49.    Xttrium has since learned that Defendants had not invested any  money into researching and/or developing the Synthesis prior to the execution of the 2015 Agreement.

50.    Anil Jain executed Exhibits A and B to the 2015 Agreement as the "Chairman" of Bajaj Medical. (Ex. A at pp. 7-8.)

51.    Upon information and belief, Anil Jain is not the Chairman of Bajaj Medical and is not affiliated with Bajaj Medical.

52.    Defendants, as agents for Xttrium, handled all of the communications, negotiations, execution and implementation of the 2015 Agreement. Xttrium never communicated with either directly; everything went through Defendants.

53.    In approximately 2018, Defendants directed Xttrium to make the quarterly payments required by the 2015 Agreement to AUA General Trading, LLC ("AGT"), an entity

operating out of Dubai, instead of Bajaj Medical. A true and accurate copy of the 2017 Addendum by and between ICT, Xttrium, and AGT is attached hereto as **Exhibit B**.

54.     Xttrium now believes this was all part of Defendants' scheme to defraud Xttrium in hopes that Xttrium would have no ability to recover the money from AGT.  On information and belief, AGT is controlled by Defendants.

55.     Defendants, as agents for Xttrium, continued to represent to Xttrium that such payments to AGT were being used for development of the Synthesis in accordance with the 2015 Agreement.  These representations were false.

56.     Xttrium timely made all payments, totaling $9MM USD, to Bajaj Medical and AGT under the 2015 Agreement, and pursuant to Chakraborty's direction.

57.     Xttrium regularly communicated with Defendants regarding the status of quarterly payments being made for work on the Synthesis.

58.     Defendants consistently represented that Xttrium's payments were being utilized for work on the Synthesis.  These representations were false, as nearly all of Xttrium's payments were pocketed by Defendants, and any development on the Synthesis was information that was secretly being kept by Defendants.

59.     Over the course of the project, Defendants, and their agent Jain, provided updates as to progress being made on developing the new Synthesis in accordance with the parameters outlined in the 2015 Agreement.  These statements were false, and intended to deceive Xttrium and induce it to keep paying Defendants.

60.     In June of 2019, Madeleine Creevy ("Ms. Creevy"), Xttrium's Executive Vice President, traveled to India with Chakroborty to meet with Jain to discuss the future of the project.

61.     Jain reported that he had successfully created a new Synthesis for producing CHG, but needed to work on purifying the Product and scaling it for commercial sale.

*2019 Scale-Up Agreement*

62.     After Jain successfully developed the new Synthesis, Xttrium executed a Purification & Scale-Up Agreement in 2019 (the "2019 Agreement") at Defendants' behest to further refine and scale up this work. A true and accurate copy of the 2019 Agreement with exhibits is attached hereto as **Exhibit C**.

63.     Once again, Defendants handled all communications with Anil Jain. Xttrium never communicated with either Defendant directly; everything went through Defendants as the agents for Xttrium.

64.     In fact, prior to sending the demand letters that preceded the filing of this Complaint, Xttrium had not spoken with Anil Jain or any of Defendants' development team since the meetings in India in 2019.

65.     In 2019, Chakraborty and Bajaj Medical arranged for their agent Jain to coordinate with another individual, Lalit Khare ("Lalit"), who worked with Jain and would be spearheading the Synthesis project due to his familiarity with the Synthesis. Xttrium later learned that this representation was untrue and was conveyed only to provide a false sense of comfort to Xttrium.

66.     The goals of the 2019 Agreement included achieving (i) obtainable starting materials at a reasonable cost; (ii) high productivity; and (iii) improved efficiency over existing methods. (Ex. C at p. 1.)

67.     Under the 2019 Agreement, Xttrium retained all intellectual property rights outlined in the 2015 Agreement with respect to the Synthesis itself, but intellectual property rights related to the purification and scale-up process were allocated as follows:

**Intellectual Property Rights.** Intellectual Property Rights means all rights in and to US (i) patents, patent disclosures, and inventions (whether patentable or not), (ii) trademarks, service marks, trade dress, trade names, logos, corporate names and domain names, and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing, (iii) copyrights and copyrightable works (including computer programs), maskworks, and rights in data and databases, (iv) trade secrets, know-how, and other confidential information, and (v) all other intellectual property rights, in each case whether registered or unregistered and including all registrations and applications for, and renewals or extensions of, such rights, and all similar or equivalent rights or forms of protection in the USA. In the interest of clarity, any intellectual property for ex-USA shall be exclusively owned by Bajaj. Bajaj's rights to any intellectual property shall survive Termination of this Agreement.

Xttrium shall have sole ownership of all Intellectual Property Rights in the USA arising from this Agreement concerning the Product, Purification & Scale-up Process owned or developed under this Agreement. No part of this Agreement shall be construed to apply to any Intellectual Property Rights owned by either Party prior to the execution of this Agreement or to any Intellectual Property Rights applicable to products or services other than the Product described herein. Intellectual Property which Bajaj is assigning includes materials, methods, steps, and use, and labeling of the Purification & Scale-up Process. In the interest of clarity, any Intellectual Property Bajaj owns or has rights to prior to the execution of this Agreement shall remain with Bajaj. Bajaj's rights to any intellectual property shall survive Termination of this Agreement.

(Ex. C at pp. 2-3.)

68. Similarly to the 2015 Agreement, Xttrium also retained the rights to any patents and trademarks in the purification and scale-up process developed under the 2019 Agreement. (*Id*.)

69. The 2019 Agreement had a term of two (2) years, with automatic annual renewals on the anniversary date unless there is written notification from either party ninety (90) days prior to the anniversary date. (Ex. C at p. 4.)

70. Pursuant to the 2019 Agreement, Xttrium made additional payments to Defendants totaling $1,109,088 USD to cover the costs of materials and other expenses to conduct research into the Purification & Scale-up Process of the Synthesis.

71. When the pandemic struck in March 2020, Xttrium did not hear anything from Defendants for months.

11

72.     In 2021, Ms. Creevy met Chakroborty for lunch in Mount Prospect, Illinois to discuss the status of the project.

73.     Chakroborty represented, on behalf of himself, Bajaj Medical, and Anil Jain, that the project could not be completed as Lalit had perished during the pandemic. Chakroborty also stated that Xttrium would have to pay significantly more money to get the project back off the ground because the Synthesis provided by Jain and ICT was purportedly deficient and all of the COVID deaths supposedly resulted in significant lost knowledge.

74.     Xttrium declined to contribute additional money, so Chakroborty stated that the contract was terminated and the project was over. Chakroborty never provided written notice of termination, which was required under the terms of the 2019 Agreement.

*2022 Meeting in India and Subsequent Communications*

75.     Although Chakroborty had represented to Xttrium that the Synthesis purification and scale-up project was not viable and no longer being pursued, Xttrium sought to formalize its rights in the Synthesis in case the opportunity arose to further the project down the line.

76.     To that end, Ms. Creevy traveled to India in September 2022 and met with Jain to discuss documents and information Xttrium needed to secure formal intellectual property rights in the Synthesis Defendants and Jain developed.

77.     During the course of the meeting, Ms. Creevy expressed her condolences for the death of Lalit, given Jain's familiarity with him in light of their joint work on the Synthesis.

78.     Jain responded with confusion and informed Ms. Creevy that Lalit had not died and was still alive.

79.     This revelation led to a cascade of information that showed Xttrium had been intentionally and methodically deceived by Defendants.

80.     Jain told Ms. Creevy that while she expected to receive a total of $230,000 USD, she had received only $200,000 USD, not the $4.5MM USD owed under the 2015 Agreement.

***Defendants' Scheme***

81.     After Chakroborty represented to Xttrium that the Purification & Scale-up Process could not be completed and there were underlying issues with the Synthesis, Defendants began soliciting contract research organizations in the United States to use the research and development done on the Synthesis, in which Xttrium owns all intellectual property rights pursuant to the 2015 Agreement, to finish the purification & scale-up process without Xttrium.

82.     Xttrium has also learned that Defendants never invested any money into the idea for the Synthesis prior to executing the 2015 Agreement, despite Defendants representing to Xttrium that Defendants had invested $4.5MM USD into the research and development, which Xttrium would have to buy out to acquire the intellectual property rights in the Synthesis.

83.     Xttrium has learned that the actual amount Defendants invested in the Synthesis is approximately $200,000 USD.

84.     None of the Defendants ever informed Xttrium that they would only be paying Jain $200,000 USD for their work on the Synthesis under the 2015 Agreement.

85.     Defendants never disclosed to Xttrium that Jain was only receiving a fraction of the amount Xttrium agreed to pay under the 2015 Agreement, and that Defendants were actually stealing the rest of the money.

86.     Prior to the filing of this Complaint, Xttrium sent letters to Chakroborty, Anil Jain, and Bajaj Medical asking for confirmation that all the payments provided by Xttrium under the 2015 Agreement were made properly, and that the Defendants were not misappropriating Xttrium's intellectual property.

87.     Defendants responded that all payments were made in accordance with the 2015 Agreement.

88.     In response, Xttrium requested that Defendants provide documentation of the payments, but Defendants refused to do so.

89.     Defendants also refused to confirm whether they were continuing to work on the Synthesis, in contravention of Xttrium's intellectual property rights.

## Count I – Breach of Fiduciary Duties (Chakroborty)

90.     Xttrium incorporates the allegations contained in paragraphs 1-89 as though fully restated herein.

91.     At all times relevant to this action, Defendant Chakroborty was the CEO and agent of Xttrium, charged with important job duties regarding Xttrium's strategies, products, pricing, formulas, research, and know-how.

92.     After resigning as CEO in or around 2013, Defendant Chakroborty agreed to serve as a consultant and agent of Xttrium, for, among other things, research, development, and procurement of new technologies, while also serving as a trusted consultant for Xttrium's business affairs, strategies, and high-level decision-making.

93.     As an agent of Xttrium, Defendant Chakroborty had a duty to: (1) not use Xttrium's trade secrets, confidential information, and other property for his own purposes; (2) not acquire a material benefit from existing or prospective customers at the expense of Xttrium; (3) not take steps to unlawfully compete against Xttrium while at the same time being an agent of Xttrium and receiving valuable compensation from Xttrium; and (4) not steal Xttrium's property and investments.

94.     Defendant Chakroborty, while still being an agent of Xttrium, breached his fiduciary duties to Xttrium by secretly usurping Xttrium's business opportunities, strategies,

customers and valuable property, and using these assets to compete against Xttrium through Bajaj Medical.

95.     Defendant Chakroborty, while still being an agent of Xttrium, further breached his fiduciary duties to Xttrium by pocketing the millions of dollars paid to him and Bajaj Medical by Xttrium for investment in the Synthesis. Chakraborty converted these funds for his own benefit while at the same time falsely conveying to Xttrium that these funds were being used for development of the Synthesis.

96.     Defendant Chakroborty's actions were not conducted in good faith.

97.     As a direct and proximate result of Defendant Chakroborty's actions, Xttrium has incurred damages, out-of-pocket expenses, missed future opportunities, punitive damages and other damages in an amount to be determined at trial.

### Count II - Fraud (Both Defendants)

98.     Xttrium incorporates the allegations contained in paragraphs 1-89 as though fully restated herein.

99.     Defendants falsely represented to Xttrium that $4.5MM USD had already been invested by Bajaj Medical into researching and developing the Synthesis. Defendants represented to Xttrium that Xttrium would need to reimburse Bajaj Medical for that $4.5MM to acquire the intellectual property rights because Bajaj Medical had already invested that sum.

100.    Defendants knew this representation was false because Bajaj Medical had not invested a single dollar into the idea for the Synthesis prior to the execution of the 2015 Agreement.

101.    Defendants made this false representation to induce Xttrium into paying more for the Synthesis project under the 2015 Agreement.

102.    Because these representations were being made by a trusted advisor—one whom Xttrium believed was looking out for Xttrium's best interests—Xttrium reasonably relied on these

representations and paid Defendants $4.5MM USD to "reimburse" Bajaj Medical for money purportedly spent on the Synthesis project, when in reality Bajaj Medical had not yet expended any money on the project.

103.    Defendants also falsely represented to Xttrium that payments totaling $9MM USD would be made to Defendants and their agent Jain for work on the Synthesis. Defendants made this representation in order to induce Xttrium to execute the 2015 Agreement.

104.    Defendants fraudulently induced Xttrium to execute the 2015 Agreement and make payments under it for development of the Synthesis.

105.    Defendants knew at the time these representations were made that nearly all of the payments from Xttrium were not being used for development of the Synthesis, and instead being pocketed by Defendants.

106.    Defendants fraudulently omitted the fact that Defendants had a separate agreement with its research team, including Jain, whereby Jain would receive $200,000 USD for work on the Synthesis project, and that Defendants would keep all intellectual property developments stemming from this work.

107.    Defendants omitted this fact to induce Xttrium into executing the 2015 Agreement and agreeing to make payments totaling $4.5MM USD for development of the Synthesis, when in reality only $200,000 of that money was invested in the Synthesis, and the other $4.3MM USD was stolen by Defendants.

108.    Because these representations were being made by a trusted advisor, Chakroborty, whom Xttrium believed was looking out for Xttrium's best interests, Xttrium reasonably relied on these representations and continued to make payments pursuant to the 2015 Agreement.

109.    Xttrium timely made all payments required under the 2015 Agreement in reliance on these misrepresentations and omissions.

110.    In 2021, Defendants further represented to Xttrium that the purification and scale-up process, which was the subject of the 2019 Agreement, was dead and not being pursued further.

111.    This representation was false, as Xttrium has since learned that since at least 2022, Defendants were soliciting CROs to complete the purification and scale-up process of the Synthesis.

112.    Defendants knew this representation to be untrue at the time it was made.

113.    Xttrium relied on Defendants' false representations and did not pursue the purification and scale-up project further with Defendants in light of Xttrium's misplaced belief that Chakroborty continued to represent Xttrium's interests in this engagement.

114.    Defendants intentionally misrepresented their ongoing work on the purification and scale-up process so that they could beat Xttrium to market with a new, cheaper CHG product and usurp Xttrium's market share in the CHG antiseptic space.

115.    As a direct and proximate result of Xttrium's reliance on the misrepresentations and omissions, Xttrium has incurred damages, out-of-pocket expenses, missed future opportunities, punitive damages and other damages in an amount to be determined at trial.

**Count III – Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, _et seq._ (Both Defendants)**

116.    Xttrium incorporates the allegations contained in paragraphs 1-89 as though fully restated herein.

117.    The federal Defend Trade Secrets Act prohibits the misappropriation of trade secrets.

118.     Xttrium has developed and owns valuable trade secrets related to its products and services that are used in, or intended for use in, interstate or foreign commerce.

119.     Xttrium further developed and owned valuable trade secrets relating to the development of the Synthesis through the 2015 and 2019 Agreements (the "Synthesis Trade Secrets"), which provided Xttrium with ownership rights to the development of the Synthesis, as a result of Xttrium's payments to Defendants to develop the Synthesis.

120.     Xttrium's Synthesis Trade Secrets include technical information relating to the Synthesis, including all know-how, procedures, formulas, methods and development-related documents for production and development of the Synthesis.

121.     Xttrium's Synthesis Trade Secrets have value because they are not generally known to the public and are not readily ascertainable.

122.     Xttrium has taken reasonable measures to safeguard its trade secrets, through its execution of the 2015 and 2019 Agreements, which provided Xttrium with ownership rights in the Synthesis Trade Secrets and also provided confidentiality protections to ensure against the unauthorized disclosure or use of this information.

123.     Defendants misappropriated Xttrium's trade secrets by unlawfully retaining all of the Synthesis Trade Secrets and related know-how and documents, despite the fact that they secured the development of these trade secrets on behalf of Xttrium, and for Xttrium's benefit.

124.     Defendants used improper means to acquire and use Xttrium's trade secrets while knowing that the acquisition and use was improper.

125.     Defendants have obtained an economic benefit from the theft of Xttrium's trade secrets, including the stealing of Xttrium's existing and prospective customers and business opportunities.

126.     As a direct and proximate result of Defendants' unlawful actions, Xttrium has suffered harm, including the loss of business, the loss of customer goodwill, and the lost value derived from Xttrium's investment in a large amount of time and resources to develop Xttrium's trade secrets.

### Count IV – Violation of the Illinois Trade Secrets Act, 765 ILCS 1065, *et seq.* (Both Defendants)

127.     Xttrium incorporates the allegations contained in paragraphs 1-89 as though fully restated herein.

128.     The Illinois Trade Secrets Act prohibits the misappropriation of trade secrets.

129.     Xttrium has developed and owns valuable trade secrets related to its products and services that are used in, or intended for use in, interstate or foreign commerce.

130.     Xttrium further developed and owned valuable trade secrets relating to the development of the Synthesis through the 2015 and 2019 Agreements (the "Synthesis Trade Secrets"), which provided Xttrium with ownership rights to the development of the Synthesis, as a result of Xttrium's payments to Defendants to develop the Synthesis.

131.     Xttrium's Synthesis Trade Secrets include technical information relating to the Synthesis, including all know-how, procedures, formulas, methods and development-related documents for production and development of the Synthesis.

132.      Xttrium's Synthesis Trade Secrets have value because they are not generally known to the public and are not readily ascertainable.

133.     Xttrium has taken reasonable measures to safeguard its trade secrets, through its execution of the 2015 and 2019 Agreements, which provided Xttrium with ownership rights in the Synthesis Trade Secrets and also provided confidentiality protections to ensure against the unauthorized disclosure or use of this information.

134.     Defendants misappropriated Xttrium's trade secrets by unlawfully retaining all of the Synthesis Trade Secrets and related know-how and documents, despite the fact that they secured the development of these trade secrets on behalf of Xttrium, and for Xttrium's benefit.

135.     Defendants used improper means to acquire and use Xttrium's trade secrets while knowing that the acquisition and use was improper.

136.     Defendants have obtained an economic benefit from the theft of Xttrium's trade secrets, including the stealing of Xttrium's existing and prospective customers and business opportunities.

137.     As a direct and proximate result of Defendants' unlawful actions, Xttrium has suffered harm, including the loss of business, the loss of customer goodwill, and the lost value derived from Xttrium's investment in a large amount of time and resources to develop Xttrium's trade secrets.

### Count V - Conversion (Both Defendants)

138.     Xttrium incorporates the allegations contained in paragraphs 1-89 as though fully restated herein.

139.     Xttrium has a right to the $4.3MM USD paid pursuant to the 2015 Agreement that Defendants have unlawfully retained.

140.     In light of Jain's admission that she received only $200,000 USD from Defendants for their research and development work on the Synthesis, Xttrium has an absolute and unconditional right to the immediate repossession of all other monies paid to Defendants.

141.     Xttrium has demanded the return of this money to no avail.

142.     Defendants have wrongfully retained these funds without authorization as part of their concerted, fraudulent acts and conspiracy.

143.   Xttrium has incurred damages in the amount of $4.3MM USD and other damages to be determined at trial.

144.   Defendants' actions have directly and proximately caused Xttrium to incur significant monetary damages in an amount to be determined at trial.

## Count VI - Conspiracy (Both Defendants)

145.   Xttrium incorporates the allegations contained in paragraphs 1-89 as though fully restated herein.

146.   Defendants jointly and collectively entered into a scheme to accomplish by concerted action an unlawful purpose or a lawful purpose.

147.   Specifically, Defendants took concerted action to defraud Xttrium out of millions of dollars by knowingly misrepresenting to Xttrium that Xttrium would have to pay millions of dollars to Defendants and their agents to develop the Synthesis, when in reality Defendants knew that they would steal nearly all of the money.

148.   As a direct and proximate result of Xttrium's reliance on the misrepresentations and omissions, Xttrium has incurred damages, out-of-pocket expenses, missed future opportunities, punitive damages and other damages in an amount to be determined at trial.

## Jury Trial

Xttrium demands a trial by jury on all counts triable by jury.

## Prayer for Relief

WHEREFORE, Plaintiff Xttrium Laboratories, Inc. respectfully requests the entry of judgment in its favor and against Defendants, and prays that the Court:

1.   Award all available monetary damages, including but not limited to compensatory damages, punitive damages due to Defendants' fraudulent conduct, costs, and attorneys' fees;

2. Award exemplary or treble damages to the extent allowed by law and in an amount according to proof;

3. Grant permanent injunctive relief against Defendants requiring (a) the immediate cessation of all transactions utilizing Xttrium's intellectual property rights in the Synthesis; (b) the immediate return of all documents, research, information, and other materials constituting the intellectual property in the Synthesis owned by Xttrium; and (c) the immediate destruction of all copies in Defendants' possession of all documents, research, information, and other materials constituting the intellectual property in the Synthesis owned by Xttrium; and

4. Grant all other relief the Court deems just and proper.

Dated: June 16, 2023

Respectfully submitted,

Xttrium Laboratories, Inc.

By: */s/ Daniel R. Saeedi*
One of Its Attorneys

Daniel R. Saeedi (#6296493)
dsaeedi@taftlaw.com
Nicollette L. Khuans (#6320914)
nkhuans@taftlaw.com
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, Illinois 60601
Telephone: 312-527-4000